UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VALERIA LOPEZ,

                              Plaintiff,

        v.

WHITE PLAINS HOSPITAL, *et al.*,

                              Defendants.

No. 19-CV-6263 (KMK)

OPINION & ORDER

Appearances:

Steven John Fingerhut, Esq.
Stefanie Lynn Shmil, Esq.
Phillips & Associates, PLLC
New York, NY
*Counsel for Plaintiff*

Harpreet Kaur, Esq.
Marianne Monroy, Esq.
Samantha Nicole Tomey, Esq.
Andrew L. Zwerling, Esq.
Garfunkel Wild, PC
Great Neck, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Valeria Lopez ("Lopez" or "Plaintiff") brings this Action against Dean Akbar ("Akbar"),

Cindy Ganung ("Ganung"), Daniel Kearney ("Kearney"), Diane Woolley ("Woolley";

collectively, "Individual Defendants"), and White Plains Hospital (the "Hospital"; collectively

"Defendants"), for discrimination and retaliation under Title VII of the Civil Rights Act of 1964

("Title VII"), 42 U.S.C. §§ 2000e, *et seq*., and for discrimination, retaliation, hostile work

environment, and aiding and abetting under the New York State Human Rights Law

("NYSHRL"), N.Y. Exec. Law §§ 296*, et seq*.  (*See generally* Compl. (Dkt. No. 1).)  Before the

Court is Defendants' Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 (the "Motion").  (*See* Not. of Mot. (Dkt. No. 68).)  For the reasons discussed below, Defendants' Motion is granted.

## I.  Background

### A.  Factual Background

The following facts are taken from Defendants' Statement Pursuant to Local Rule 56.1, (Defs.' Rule 56.1 Statement in Supp. of Mot. ("Defs.' 56.1") (Dkt. No. 77)), Plaintiff's Statement Pursuant to Local Rule 56.1, (Pl.'s Rule 56.1 Statement in Opp'n to Mot. ("Pl.'s 56.1") (Dkt. No. 80)), Defendants' Counter Statement Pursuant to Civil Rule 56.1, (Defs.' Counter Statement in Supp. of Mot. ("Defs.' Counter 56.1") (Dkt. No. 89)), and the other admissible evidence submitted by the Parties, and are recounted "in the light most favorable to" Plaintiff, the non-movant.  *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018) (quotation marks omitted); *see also Johnson v. Kitt*, No. 15-CV-7823, 2021 WL 1105438, at *1 (S.D.N.Y. Mar. 23, 2021).

Plaintiff was employed by the Hospital as a Learning and Organizational Development ("LOD") Specialist from November 5, 2018, to January 15, 2019.  (Defs.' 56.1 ¶ 3; Pl.'s 56.1 ¶ 3.)  At the time of Plaintiff's employment, Akbar, who was Plaintiff's direct supervisor, was the Director of Education and Organizational Development, (Defs.' 56.1 ¶¶ 5, 15; Pl.'s 56.1 ¶¶ 5, 15), Ganung and Kearney were Directors of Human Resources, (Defs.' 56.1 ¶¶ 7, 9; Pl.'s 56.1 ¶¶ 7, 9), and Woolley was the Chief Human Resources Officer, (Defs.' 56.1 ¶ 8; Pl.'s 56.1 ¶ 8). Plaintiff's responsibilities included "[f]acilitating meetings, employee orientation and development experiences; [] coordinating monthly new hire orientation; [] scheduling classes; [] assessing training and coordinating training space and materials and tracking attendance and

evaluation of programs, and [] performing related duties as assigned." (Defs.' 56.1 ¶ 14.) At the time of Plaintiff's employment, her team consisted of 75% female employees, 50% of which were minorities. (*Id.* ¶ 100.)

On November 5 and 6, 2018, Plaintiff participated in the Hospital's orientation program. (Defs.' 56.1 ¶ 16; Pl.'s 56.1 ¶ 16.) Following the orientation, Plaintiff and her team met with Akbar to de-brief the orientation and discuss ways to improve the program in the future. (Defs.' 56.1 ¶ 18; Pl.'s 56.1 ¶ 18.) During this session, Plaintiff gave feedback. (Defs.' 56.1 ¶ 19; Pl.'s 56.1 ¶ 19.) A few days later, on November 9, 2018, Akbar met with Plaintiff and told her that her communication style during the post-orientation de-brief had caused some team members to feel discouraged from participating. (Defs.' 56.1 ¶ 21; Pl.'s 56.1 ¶ 21.) Plaintiff responded that she believed it was too early for Akbar to be giving her such feedback and that it would have been better received if "there was a relationship there." (Pl.'s 56.1 ¶ 22.)

On December 20, 2018, Plaintiff met with Akbar again. (Defs.' 56.1 ¶ 25; Pl.'s 56.1 ¶ 25.) During the meeting, Plaintiff and Akbar reviewed the Human Resources Department's orientation checklist, which assists new hires during the onboarding process. (Defs.' 56.1 ¶ 26; Pl.'s 56.1 ¶ 26.) When they reached the checklist item related to the Hospital's dress code policy, Akbar suggested that Plaintiff schedule a meeting with Ganung because he allegedly did not feel comfortable addressing the topic with Plaintiff himself. (Defs.' 56.1 ¶ 26; Pl.'s 56.1 ¶ 26.) Following the meeting with Akbar, Plaintiff sent Ganung a calendar invitation for a meeting. (Defs.' 56.1 ¶ 44; Pl.'s 56.1 ¶ 44.)

During the December 20, 2018 meeting, Plaintiff and Akbar also discussed Plaintiff's concerns about the alignment between her expectations for the role and the requirements of her position, including that she was being asked to perform administrative functions that she

3

believed were outside the scope of her job description.  (Defs.' 56.1 ¶¶ 28–29; Pl.'s 56.1 ¶¶ 28–29.)  Plaintiff alleges that during the meeting, Akbar referred to her as a "free spirit," which Plaintiff interpreted to be a "a discriminatory stereotype of Latina women, and a racialized term." (Pl.'s 56.1 at 21.)[1]  Plaintiff told Akbar that they should "wait until the end of her six-month probationary period" to determine whether the LOD Specialist position was the right fit for her. (Defs.' 56.1 ¶ 30; Pl.'s 56.1 ¶ 30.)

Plaintiff was involved in facilitating an orientation session that occurred on January 7 and 8, 2019.  (Defs.' 56.1 ¶ 31; Pl.'s 56.1 ¶ 31.)  One of Plaintiff's responsibilities involved providing attendees with a five-minute warning before sessions to give them an opportunity to use the restroom.  (Defs.' 56.1 ¶ 33; Pl.'s 56.1 ¶ 33.)  On the first day of the orientation, Plaintiff gave a five-minute warning in which she stated that "ladies" should take this time to use the restroom.  (Defs.' 56.1 ¶ 33; Pl.'s 56.1 ¶ 33.)  When Bernadette Amicucci, the Hospital's Director of Clinical Education, asked Plaintiff if "ladies are the only ones who use the restroom," Plaintiff responded, "yes."  (Defs.' 56.1 ¶ 34; Pl.'s 56.1 ¶ 34.)  Plaintiff alleges that she also stated that everyone should use the restroom, and that she displayed a PowerPoint slide that contained a similar reminder.  (Defs.' 56.1 ¶ 33; Pl.'s 56.1 ¶ 33.)

On the second day of the orientation, Susan O'Boyle ("O'Boyle"), the Vice President of Quality and Regulatory Affairs, was scheduled to present on the topic of national safety goals. (Defs.' 56.1 ¶ 35; Pl.'s 56.1 ¶ 35.)  O'Boyle was running late to the presentation, so Plaintiff decided to present the topic herself.  (Defs.' 56.1 ¶ 36; Pl.'s 56.1 ¶ 36.)  Plaintiff did this without

---

[1] Starting on page 20 of Plaintiff's 56.1, there is a section entitled "Plaintiff's Counter-Statement of Undisputed Facts."  (*Id.* at 20.)  Rather than continuing the paragraph numbering from the earlier portion of the document, in which Plaintiff responds to the facts proffered by Defendants, Plaintiff re-starts the numbering in this new section.  In order to avoid confusion, the Court will cite to the page numbers in this section, rather than the paragraph numbers.

contacting O'Boyle to ascertain  her estimated time of arrival or anyone else on her team to seek guidance on how to proceed.  (Defs.' 56.1 ¶ 36; Pl.'s 56.1 ¶ 36.)  Plaintiff did not assist in the preparation of O'Boyle's presentation, nor did she have an outline of talking points.  (Defs.' 56.1 ¶ 40; Pl.'s 56.1 ¶ 40.)  Rather, Plaintiff relied on the presentation slides and her recollection of O'Boyle's presentation, which she had heard during a prior orientation session.  (Defs.' 56.1 ¶ 40; Pl.'s 56.1 ¶ 40.)  Plaintiff was aware that this presentation was a mandated component of the Joint Commission accreditation process, which the Hospital was then-currently undergoing. (Defs.' 56.1 ¶¶ 37–38; Pl.'s 56.1 ¶¶ 37–38.)

After the presentation, Plaintiff informed Akbar that she had presented on behalf of O'Boyle.  (Defs.' 56.1 ¶ 42; Pl.'s 56.1 ¶ 42.)  Later that afternoon, Akbar allegedly recommended Plaintiff's termination to Woolley, on the basis of her "recent misconduct at the January 7–8, 2019 orientation, during which she made an inappropriate gender-based comment and presented for a Hospital Vice President without authorization or proper qualifications, and other ongoing performance issues."  (Defs.' 56.1 ¶ 43.)  Wooley allegedly agreed with Akbar's recommendation.  (*Id*.)

On January 9, 2019, Plaintiff and Ganung held their previously-scheduled meeting regarding the Hospital's dress code.  (Defs.' 56.1 ¶ 44; Pl.'s 56.1 ¶ 44.)  During the meeting, Ganung reviewed the Hospital's dress code policy with Plaintiff, which Ganung described as "conservative."  (Defs.' 56.1 ¶ 49; Pl.'s 56.1 ¶ 49.)  Ganung provided  Plaintiff with a packet containing photographic examples of appropriate work attire.  (Defs.' 56.1 ¶ 49; Pl.'s 56.1 ¶ 49.) Plaintiff alleges that, at this meeting, she was "forced to discuss her nail polish, the color and fit of her clothing, and her jewelry."  (Pl.'s 56.1 at 21.)

During the same meeting, Plaintiff and Ganung also discussed Plaintiff's general experience thus far at the Hospital.  (Defs.' 56.1 ¶ 55; Pl.'s 56.1 ¶ 55.)  Plaintiff told Ganung that she thought it was inappropriate for Akbar to give her feedback on her performance during her first week of employment.  (Defs.' 56.1 ¶ 56; Pl.'s 56.1 ¶ 56.)  Plaintiff also told Ganung that she did not agree with having to obtain Akbar's approval prior to sending out certain emails.  (Defs.' 56.1 ¶ 56; Pl.'s 56.1 ¶ 56.)  Plaintiff also complained to Ganung about an incident where Akbar inquired about Plaintiff's whereabouts during her lunch break.  (Defs.' 56.1 ¶ 58; Pl.'s 56.1 ¶ 58.)  Specifically, on December 19, 2018, after Plaintiff returned from lunch, Akbar requested that Plaintiff inform him if she intended to take lunch outside the customary period.  (Defs.' 56.1 ¶ 59; Pl.'s 56.1 ¶ 59.)  Plaintiff stated that the fact that Akbar was monitoring her location displayed his "white supremacy values."  (Defs.' 56.1 ¶ 60; Pl.'s 56.1 ¶ 60.) [2]  Plaintiff also stated that the fact that Akbar questioned her for making the presentation for O'Boyle was an example of "unwarranted control" by Akbar.  (Defs.' 56.1 ¶ 61; Pl.'s 56.1 ¶ 61.)

On January 10, 2019, Plaintiff met with Akbar again to discuss the January 7–8 orientation.  (Defs.' 56.1 ¶ 67; Pl.'s 56.1 ¶ 67.)  Akbar asked Plaintiff about the comment she made on the first day of the orientation, in which she advised "ladies" to take the time "go to the bathroom."  (Defs.' 56.1 ¶ 69.)  Specifically, when Akbar inquired whether Plaintiff believed someone present at the orientation might have found Plaintiff's comment singling out only a fraction of the group offensive, Plaintiff replied in the negative.  (*Id*.)  Plaintiff further stated that although she did not object to the feedback, she would have preferred to hear it from someone who was present when the comment was made and took offense.  (Defs.' 56.1 ¶ 69; Pl.'s 56.1 ¶

---

[2] Defendants note that Akbar is Black/African American.  (Defs.' 56.1 ¶ 6.)

69.)  Akbar and Plaintiff also discussed Plaintiff's conduct on the second day of the orientation, when she gave the presentation for O'Boyle.  (Defs.' 56.1 ¶¶ 70–71; Pl.'s 56.1 ¶ 70–71.)

Later in the afternoon on January 10, 2019, Akbar met with Ganung and Kearney to discuss the Hospital's termination process.  (Defs.' 56.1 ¶ 75.)  During the meeting, Akbar informed Ganung and Kearney of his and Woolley's decision to terminate Plaintiff's employment due to "ongoing performance flaws and her recent conduct at the January 7–8, 2019 orientation program."  (*Id.* ¶ 76.)  Akbar also informed Ganung and Kearney that he intended to notify Plaintiff of her termination on January 17, 2019, during their pre-scheduled two-month check-in meeting.  (*Id.* ¶ 77.)

On the morning of January 11, 2019, Plaintiff sent Akbar an email in which she stated that, moving forward, she would not "take initiative," and if an issue arose during an orientation, she would wait for directions—thus causing new hires to wait.  (*Id.* ¶ 74.)  On the same day, Plaintiff also submitted an internal complaint alleging discrimination.  (Defs.' 56.1 ¶ 80; Pl.'s 56.1 ¶ 80.)  Plaintiff's complaint was "based in part on her perception that she was discriminated against based on her status as a Latina during the meeting where Ms. Ganung discussed the dress code with her."  (Pl.'s 56.1 at 21.)  Plaintiff sent the complaint via email to Woolley and copied Susan Fox, the Hospital's Chief Executive Officer, on the email.  (Defs.' 56.1 ¶ 82; Pl.'s 56.1 ¶ 82.)  Later that day, Plaintiff met with Kearney and Wooley to discuss her complaint.  (Defs.' 56.1 ¶ 83; Pl.'s 56.1 ¶ 83.)

Later in the afternoon on January 11, 2019, Kearney observed that Plaintiff's workspace appeared to be empty.  (Defs.' 56.1 ¶ 84.)  Specifically, Kearney observed that Plaintiff's drawers were empty and her work laptop and charger, which enables Hospital employees to work remotely from home, were left on top of her desk.  (*Id.* ¶ 85.)  Kearney took photographs of

Plaintiff's desk to document his observations. (*Id*.) It appeared to Kearney and Woolley that Plaintiff had abandoned her job. (*Id*. ¶ 86.)[3] In accordance with Hospital protocol, Mr. Kearney contacted the Information Technology Department to request the suspension of Plaintiff's access to Hospital systems and her emails, until the Hospital could obtain more information on whether Plaintiff intended to return to work. (*Id*. ¶¶ 87–88.) Kearney was allegedly unaware that Plaintiff's badge, which gave her access to the Hospital premises, had also been suspended. (*Id*. ¶ 89.) When Plaintiff returned to work on Monday, January 14, 2019, her badge access was reinstated. (Defs.' 56.1 ¶ 90; Pl.'s 56.1 ¶ 90.)

Kearney conducted an investigation into Plaintiff's discrimination complaint. (Defs.' 56.1 ¶ 91.) He interviewed several individuals, including Josiah Giuliano ("Giuliano"), Deborah Frantzen ("Frantzen"), Annie Norris ("Norris"), Michelle Whitfield ("Whitfield"), Deborah Soto ("Soto"), John Sanchez ("Sanchez"), Ganung, and Akbar. (*Id*.) The interviewees described Akbar's management style as inclusive and conscious of diversity. (*Id*. ¶ 93) Frantzen, Norris, Whitfield, and Soto stated that they never witnessed or personally experienced discrimination by Akbar based on their gender. (*Id*. ¶ 94.) Similarly, Soto, a woman of Latina origin, denied experiencing any discrimination based on age, gender, and/or ethnicity by Akbar. (*Id*. ¶ 95.) Sanchez, also of Latino origin, stated that he was unaware of the term "free-spirit" having any derogatory or negative connotation in the Latin American or Hispanic culture. (*Id*. ¶ 96.) Following these interviews, Kearney concluded that the allegations in Plaintiff's complaint were unsubstantiated, and he drafted a report reflecting that conclusion. (*Id*. ¶ 98.) Kearney and

---

[3] Plaintiff alleges that she did not abandon her job; rather, she claims that her workspace was empty during the entire course of her employment. (Pl.'s 56.1 ¶ 86.)

Plaintiff met on January 14, 2019, to go over the findings in the report.  (Defs.' 56.1 ¶ 99; Pl.'s 56.1 ¶ 99.)

On January 15, 2019, Plaintiff called in sick.  (Defs.' 56.1 ¶ 101; Pl.'s 56.1 ¶ 101.)  At that point, Kearney and Wolley decided not to wait until January 17, 2019 to terminate Plaintiff, because "having Plaintiff report to work for one additional day would provide no benefit to Plaintiff or the Hospital."  (Defs.' 56.1 ¶ 101.)  Kearney executed and sent Plaintiff a termination letter, which notified Plaintiff of her termination due to "her inability to meet the performance thresholds of the Hospital and Human Resources Department, including: (i) an inability or unwillingness to accept constructive feedback; (ii) an inability to take direction; (iii) persistence in overstepping authority; and (iv) an inability to recognize and accept her role within a larger organization."  (*Id*. ¶ 103.)  The letter also mentioned Plaintiff's discrimination complaint, and stated that after a thorough investigation, the Hospital had determined that the complaint lacked merit.  (*Id*. ¶ 104.)

Plaintiff brings three Causes of Action: (1) discrimination and retaliation under Title VII, (Compl. ¶¶ 47–54), (2) discrimination, retaliation, and hostile work environment under the NYSHRL, (*id*. ¶¶ 55–61), and (3) aiding and abetting under the NYSHRL, (*id*. ¶¶ 62–66).  Plaintiff seeks damages for lost wages and benefits resulting from Defendants' alleged discrimination and retaliation; compensatory damages for mental, emotional, and physical injury; punitive damages; and attorney's fees and costs.  (*Id.* ¶¶ A–E.)

B.  Procedural History

Plaintiff filed her Complaint on July 5, 2019.  (Dkt. No. 1.)  Defendants filed an Answer on September 30, 2019.  (Dkt. No. 15.)  On January 8, 2020, the Court adopted a Case Management Plan and Scheduling Order.  (Dkt. No. 21.)  Following discovery, Defendants filed

the instant Motion for Summary Judgment and accompanying papers on June 10, 2021.  (Dkt.

Nos. 68–77.)  Plaintiff filed her Opposition and accompanying papers on August 2, 2021.  (Dkt.

Nos. 80–82.)  On September 30, 2021, Defendants filed their Reply and accompanying papers.

(Dkt. Nos. 87–89.)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED.

R. CIV. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir.

2014) (same).  "In determining whether summary judgment is appropriate," a court must

"construe the facts in the light most favorable to the non-moving party and . . . resolve all

ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653

F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted); *see also Borough of Upper Saddle River

v. Rockland Cnty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  "It is the

movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800*

*Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Red Pocket, Inc. v. Interactive*

*Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4 (S.D.N.Y. Feb. 20, 2020)

(same); *Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) (same).

 "However, when the burden of proof at trial would fall on the non[-]moving party, it

ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an

essential element of the non[-]movant's claim," in which case "the non[-]moving party must

come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order

to avoid summary judgment."  *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d

114, 123 (2d Cir. 2013) (alteration and quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a non-movant] need[s] to create more than a 'metaphysical' possibility that his allegations [are] correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").  Indeed, "[w]hile summary judgment must be granted with caution in employment discrimination actions, . . . a plaintiff must prove more than conclusory allegations of discrimination to defeat a motion for summary judgment."  *Aspilaire v. Wyeth Pharms., Inc.*, 612 F. Supp. 2d 289, 302 (S.D.N.Y. 2009) (quotation marks omitted); *see also Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 608 (2d Cir. 2006) ("[I]t is the law of this Circuit that summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact, and may be appropriate even in the fact-intensive context of discrimination cases."  (citation and quotation marks omitted)).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law."  *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted).  At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."  *Brod*, 653 F.3d at 164 (citation omitted).  Thus, a court's goal should be "to

isolate and dispose of factually unsupported claims." *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

When ruling on a motion for summary judgment, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting FED. R. CIV. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ."); *Baity v. Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (citation omitted)).

As a general rule, "district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage." *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (noting that at the summary judgment stage, the court is not to "weigh the evidence and determine the truth of the matter"); *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (quotation marks omitted)). Where the evidence presents "a question of 'he said, she said,'" the court "cannot . . . take a side at the summary judgment

stage." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010); *see also Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 535 (S.D.N.Y. 2017) (noting that "it is not the role of the [c]ourt at summary judgment to resolve [a] factual clash"); *Bale v. Nastasi*, 982 F. Supp. 2d 250, 258–59 (S.D.N.Y. 2013) (stating that "where each side . . . tells a story that is at least plausible and would allow a jury to find in its favor, it is for the jury to make the credibility determinations and apportion liability, and not for the court"). And, even if the non-movant's evidence is "thin, [a non-movant's] own sworn statement is adequate to counter summary judgment." *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003); *see also id.* at 290 (holding that "[t]he credibility of [the plaintiff's] statements and the weight of contradictory evidence may only be evaluated by a finder of fact").

B.  Analysis

1.  Discrimination Claims

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The NYSHRL echoes this prohibition and adds to it, prohibiting discrimination against an employee based on that employee's "age, race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or status as a victim of domestic violence." N.Y. Exec. Law § 296(1). Claims of discrimination under both Title VII and the NYSHRL are analyzed pursuant to the familiar three-part framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 74–75 (2d Cir. 2016); *see also Farmer v. Shake Shack Enters.*, 473 F. Supp. 3d 309, 323

13

(S.D.N.Y. 2020) ("Claims under both Title VII and the NYSHRL . . . are generally treated as 'analytically identical,' and addressed together." (quoting *Lenzi v. Systemax*, 944 F.3d 97, 107 n.7 (2d Cir. 2019))).

"Under this framework, at the summary judgment stage, a plaintiff must first demonstrate a prima facie case of employment discrimination by showing that: '(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.'" *Farmer*, 473 F. Supp. 3d at 324 (italics omitted) (quoting *Menaker v. Hofstra Univ.*, 935 F.3d 20, 30 (2d Cir. 2019)); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008) (same). "The burden of establishing a prima facie case is not onerous, and has been frequently described as minimal." *Walsh*, 828 F.3d at 75 (quoting *Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998)). "The burden of production then shifts to the defendant to offer a legitimate, non-discriminatory reason for the allegedly discriminatory conduct," and "[u]pon such a showing, the plaintiff must demonstrate that the reasons offered by the defendant are a mere pretext for discrimination." *Farmer*, 473 F. Supp. 3d at 324 (citing *Littlejohn v. City of New York*, 795 F.3d 297, 307–08 (2d Cir. 2015)); *see also Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014) ("[T]he final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination.").

### a.  Prima Facie Case

To establish a prima facie case of discrimination, a plaintiff must show that "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (citing *McDonnell Douglas*, 411

U.S. at 802).  As it concerns the fourth prong, "a plaintiff need only give plausible support to

a minimal inference of discriminatory motivation."  *Vega v. Hempstead Union Free Sch. Dist*.,

801 F.3d 72, 84 (2d Cir. 2015) (quotation marks omitted).  Nevertheless, "summary judgment

remains available to reject discrimination claims in cases lacking genuine issues of material

fact."  *Chambers v. TRM Copy Ctrs. Corp*., 43 F.3d 29, 40 (2d Cir. 1994).

      Defendants do not dispute that Plaintiff satisfies the first and third elements—i.e., that

Plaintiff, who is a female Latina, is a member of a protected class, and that because she was

terminated, she suffered an adverse employment action.  (*See* Defs.' Mem. of Law in Supp. of

Mot. for Summ. Judg. ("Defs.' Mem.") at 8 (Dkt. No. 76).)  However, Defendants argue that

Plaintiff cannot demonstrate the second and fourth elements—i.e., that she was qualified for her

position and that there is evidence giving rise to an inference of discrimination.  (*See id.*)

      Defendants argue that Plaintiff cannot satisfy the second element because she did not

"perform[] her job duties satisfactorily."  (*Id.*)  However, "[w]ith regard from being qualified for

any particular position, *McDonnell Douglas* requires only a minimal showing of qualification to

establish a prima facie claim."  *Virag v. Goodwill Indus. of W. Conn., Inc.*, No. 11-CV-1499,

2015 WL 540607, at *4 (D. Conn. Feb. 10, 2015) (italics and quotation marks omitted); *see also*

*Owens v. N.Y.C. Hous. Auth.*, 934 F.2d 405, 409 (2d Cir. 1991) (explaining that a plaintiff "only

needs to demonstrate that she possesses the basic skills necessary to perform the job" to establish

that she is qualified (quotation marks and alteration omitted))*.*  Although "performance can be

relevant to [a plaintiff's] qualifications, the bar is low."  *Singh v. Knuckles, Komosinski &*

*Manfro, LLP*, No. 18-CV-3213, 2020 WL 6712383, at *10 (S.D.N.Y. Nov. 16, 2020).  Indeed,

"[t]he qualification prong must not . . . be interpreted in such a way as to shift onto the plaintiff

an obligation to anticipate and disprove, in his prima facie case, the employer's proffer of a

legitimate non-discriminatory basis for its decision." *Boatright v. U.S. Bancorp*, No. 18-CV-7293, 2020 WL 7388661, at *14 (S.D.N.Y. Dec. 16, 2020) (alterations in original) (italics omitted) (quoting *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001)). "The inquiry must wait until the burden has shifted to the defendant." *Id.*

Here, Plaintiff appears to have had the basic qualifications necessary to perform the position of LOD Specialist.  Akbar stated in his deposition that when he hired Plaintiff, he thought her resume "was impressive."  (Decl. of Steven John Fingerhut, Esq. ("Fingerhut Decl.") Ex. 1 ("Akbar Dep."), at 18 (Dkt. No. 82-1).)  Although Akbar had some questions regarding Plaintiff's motivation to perform administrative tasks, (*see id.* at 29), Akbar stated that "in terms of technical skill for a part of what the role was asking for, she was qualified and there was no question," (*id.* at 35).  Similarly, Ganung recalled thinking that Plaintiff "presented herself well" in her interview, and Ganung "endorse[d]" Plaintiff for the position of LOD Specialist.  (Decl. of Harpreet Kaur, Esq. ("Kaur Decl.") Ex. E ("Ganung Dep."), at 23 (Dkt. No. 70-1).)  And at Woolley's deposition, when asked whether Plaintiff was qualified for her role, Woolley answered in the affirmative.  (Kaur Decl. Ex. F ("Woolley Dep."), at 38 (Dkt. No. 70-2).)

"In a discharge case in which the employer has already hired the employee into the job in question, the inference of minimal qualification is, of course, easier to draw than in a hiring or promotion case because, by hiring the employee, the employer itself has already expressed a belief that she is minimally qualified." *Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001). Additionally, the court in *Boatright* found that the plaintiff met the qualification prong where the plaintiff "had years of experience," even though she "did suffer from performance deficiencies." 2020 WL 7388661, at *14.  Construing the facts in the light most favorable to Plaintiff, it is clear that Plaintiff possessed the basic skills necessary to be considered qualified for the job despite

16

her performance issues, which the Court will address below.  The Court therefore finds that Plaintiff has met the minimal burden imposed by the second element.

As for the fourth element, "[t]he necessary inference may be derived from a variety of circumstances, including 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'" *Detouche v. JTR Transp. Corp.*, No. 17-CV-7719, 2020 WL 7364116, at *10 (S.D.N.Y. Dec. 14, 2020) (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009), *superseded by statute on other grounds*; *see also Koppar v. Orange Reg'l Med. Ctr.*, No. 19-CV-11288, 2022 WL 348172, at *14 (S.D.N.Y. Feb. 3, 2022) (same). Alternatively, "a plaintiff also may create a 'mosaic of intentional discrimination by identifying bits and pieces of evidence that together give rise to an inference of discrimination.'" *Stinnett v. Delta Air Lines, Inc.*, 278 F. Supp. 3d 599, 611–12 (E.D.N.Y. 2017) (quoting *Vega*, 801 F.3d at 87).

Defendants argue that the "record is devoid of facts that Plaintiff was terminated because of her race, gender[,] or other discriminatory factor." (Defs.' Mem. at 10.)  The only argument that Plaintiff makes in response is that the temporal proximity between when she lodged her discrimination complaint and when she was terminated supports an inference of discrimination. (Pl.'s Opp'n to Defs.' Mot. for Summ. Judg. ("Pl.'s Opp'n") at 5–6 (Dkt. No. 81).)  This argument— that Defendants terminated Plaintiff because she lodged a discrimination complaint—is relevant to Plaintiff's *retaliation* claims, not her discrimination claims. *See Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 362–63 (S.D.N.Y. 2006) ("Although many of the events described by [the] [p]laintiff do not [support her] intentional discrimination claim, they

17

may still be considered in the context of her retaliation claim."); *see also CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 460 (2008) (Thomas, J., dissenting) ("Retaliation is not discrimination based on race. When an individual is subjected to reprisal because he has complained about racial discrimination, the injury he suffers is not on account of his *race*; rather, it is the result of his *conduct*." (emphasis in original)).  Indeed, the cases that Plaintiff cites in support of this argument are retaliation cases.  *See El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) ("The temporal proximity of events may give rise to an inference of *retaliation* for the purposes of establishing a prima facie case of retaliation . . . ." (emphasis added)); *Cifra v. G.E. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) ("The causal connection needed for proof of a *retaliation* claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." (quotation marks omitted) (emphasis added)); *Feliciano v. City of New York*, No. 14-CV-6751, 2015 WL 4393163, at *10 (S.D.N.Y. July 15, 2015) ("Under both federal and state case law, where no additional facts are pled, temporal proximity ordinarily requires that the allegedly *retaliatory* act occur within two months of the plaintiff's protected activity." (emphasis added)).  The only discrimination case that Plaintiff cites is *Karatzas v. Herricks Union Free Sch. Dist.,* No. 15-CV-2888, 2017 WL 3084409 (E.D.N.Y. July 18, 2017), but in that case, the plaintiff alleged disability discrimination, which is subject to a slightly different standard for purposes of causation.  *See id.* at *15 ("[T]he timing of an adverse employment action may also present sufficient circumstantial evidence to raise an inference of disability discrimination . . . [where there is] proof of close temporal proximity between the employer's receipt of *notice of the [p]laintiff's disability* and an adverse employment action." (emphasis added)).  The Court will discuss Plaintiff's retaliation claims infra.

18

Although Plaintiff does not specifically mention this argument in her brief or Complaint, for the sake of thoroughness, the Court notes that Plaintiff cannot demonstrate an inference of discrimination through her claim that her similarly situated Caucasian female colleagues were not reprimanded for allegedly breaking the dress code.  In her deposition, Lopez stated that two Caucasian colleagues, whom she believed were named Lori and Lindsay, were "not expected to comply with" the dress code.  (Kaur Decl. Ex. D ("Lopez Dep."), at 67–70 (Dkt. No. 69-4).)  Specifically, she stated that Lori wore skirts that "hit right above the knee" and "wore colors." (*Id.* at 68.)  She also stated that Lindsay "would wear open back tops" but because she wore "a cami underneath," "she wasn't showing any skin."  (*Id.* at 69–70.)  First, it does not appear that these identified colleagues actually violated the Hospital's dress code.  (*See* Kaur Decl. Ex. J ("Hospital Dress Code Policy"), at 1–2 (Dkt. No. 70-6).)  For instance, the dress code does not prohibit colors, and although and it suggests that skirts/dresses should be "no shorter than 1 [inch]" above the knee," (*see id.*), Lopez's statements at her deposition indicate that Lori's skirt was in fact in compliance with this guideline, (Lopez Dep. at 68)*.*  Second, "a plaintiff relying on disparate treatment evidence 'must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.'"  *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)). Lopez fails to articulate how she was similarly situated in all material aspects to Lori and Lindsay.  In fact, she fails to identify even one way in which she was similarly situated to them, other than the fact that they all shared the same employer.

Plaintiff also fails to show an inference of discrimination based on her allegation that Defendants made sexist and anti-Latina statements to her.  She highlights three statements in particular.  First, Plaintiff claims that during their November 9, 2018, meeting, Akbar gave

Plaintiff the feedback that "when you speak, you speak as if your opinion is the only opinion that matters and nobody else's." (Lopez Dep. at 90.) Plaintiff explained during her deposition: "[A]s a women, . . . [w]as he getting at that I was bossy? . . . As a Latina, there are plenty of stereotypes out there of the over-assertive, sassy Latina who—who is also wild. So that's why the statement, I found to be discriminatory . . . ." (*Id*. at 90–91.) Second, Plaintiff claims that Akbar called her a "free spirit" during their meeting on December 20, 2018, which Plaintiff interpreted to be a "discriminatory and negative stereotype of Latina women." (Pl.'s Opp'n at 10; *see also* Lopez Dep. at 101 ("[W]hat really offended me though was on December 20th, when he called me a 'free spirit' which I think is an attack on my Latinidad—my Latina identity.").) Plaintiff explained during her deposition that she believes the term "free spirit" "plays to the stereotype of a Latina . . . . [It says] [t]hat she does not conform to white norms. That she does not conform to the . . . culture." (Lopez Dep. at 106.) Third, Plaintiff alleges that during her January 9, 2019 meeting with Ganung regarding the Hospital's dress code, Ganung made comments about Plaintiff's appearance that she interpreted as discriminatory. (*See* Pl.'s Opp'n at 10.) Lopez stated during her deposition

> [Ganung] told me that I could not wear bright clothing, that that wasn't something that was allowed even though it is not in the policy . . . . She told me the jewelry that I was wearing at the time was bright. And she told me that what I would wear to go to a club is not something that I would wear to go to work. Again, my understanding of a white supremacy culture [is that] being different, being Latina[,] [and] showing your Latinidad is not allowed.

(Lopez Dep. at 128.)

The Court notes at that outset, that these comments appear to be facially neutral and non-discriminatory—in fact, they do not appear to have anything to do with her race or ethnicity at all. Indeed, Plaintiff cites no authority to support her position, and relies only on her belief that these comments reflected discriminatory intent. Her subjective belief, however, is far from

sufficient to establish discriminatory conduct. *See Nguyen v. Dep't of Corr. & Cmty. Servs.*, 169 F. Supp. 3d 375, 390 (S.D.N.Y. 2016) (finding that "bare suspicions of discrimination in the absence of any supporting evidence will not suffice" to survive summary judgment); *Mixon v. Buffalo Med. Grp., P.C.*, No. 10-CV-1043, 2013 WL 597594, at *6 (W.D.N.Y. Jan. 28, 2013) ("Feelings [of discrimination] are not evidence." (alteration in original) (citation omitted)), *report and recommendation adopted*, 2013 WL 593985 (W.D.N.Y. Feb. 15, 2013); *Sibilla v. Follett Corp.*, No. 10-CV-1457, 2012 WL 1077655, at *8 (E.D.N.Y. Mar. 30, 2012) (noting that "an employee's feelings and perceptions of being discriminated against are not evidence of discrimination" (citing *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 456 (2d Cir. 1999))); *Garcia v. Henry St. Settlement*, 501 F. Supp. 2d 531, 541 (S.D.N.Y. 2007) ("Speculation, conjecture[,] and guess-work cannot substitute for actual evidence of discrimination."); *Williams v. All. Nat'l Inc.*, No. 98-CV-7984, 2001 WL 274107, at *5 (S.D.N.Y. Mar. 19, 2001) (noting that a plaintiff's "beliefs cannot replace the 'admissible evidence' required to permit an inference of discrimination and survive summary judgment"), *aff'd*, 24 F. App'x 50 (2d Cir. 2001).

Even if they were actionable remarks, however, they would not support an inference of discrimination. "It is well established that 'the stray remarks [even] of a decision-maker, without more, cannot prove a claim of employment discrimination.'" *Hasemann v. United Parcel Serv. of Am., Inc.*, No. 11-CV-554, 2013 WL 696424, at *6 (D. Conn. Feb. 26, 2013) (alteration in original) (quoting *Abdu–Brisson v. Delta Airlines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001)); *see also White v. Andy Frain Servs., Inc.*, 629 F. App'x 131, 134 (2d Cir. 2015) (summary order) (noting that "stray remarks, without other indicia of discrimination, are not enough" to survive summary judgment, and finding that a supervisor's "off-color comments over the course of a year and a half about [the plaintiff] being black and Jewish" were merely stray remarks because

there was no "causal connection between these remarks and any employment action of which [the plaintiff] complain[ed]" (quotation marks omitted)). Courts in this district have dismissed claims of discrimination with far more invidious comments. *See, e.g.*, *Lee v. Winthrop Univ. Hosp.*, No. 13-CV-5003, 2015 WL 7161955, at *16 (E.D.N.Y. Nov. 13, 2015) (finding that "no reasonable juror could conclude that the [the defendants'] alleged comments had anything to do with [their] decision to terminate the [p]laintiff's employment," even when these comments included calling the plaintiff a "black son"); *Rajaravivarma v. Bd. of Trs. for Conn. State Univ. Sys.*, 862 F. Supp. 2d 127, 135, 151–53 (D. Conn. 2012) (finding that a "reasonable juror could not view the content of [the supervisor's] remarks as discriminatory," where, after the plaintiff explained that the lab was messy because he was in India for a Hindu ceremony, the defendant retorted, "I don't care what your religious beliefs are, I don't care about them. I care about the lab. . . . The lab was messy. I don't care what you were doing, you son-of-a-bitch."); *cf. Sethi v. Narod*, 12 F. Supp. 3d 505, 538 (E.D.N.Y. 2014) (finding statement, "'You f—king Indian, what do you think about yourself? I will make sure you are sent back to India . . . ' [to] evince[] animus based on [the] [p]laintiff's Indian origin, and [that] a reasonable jury could find the statement discriminatory"); *O'Diah v. Yogo Oasis*, 954 F. Supp. 2d 261, 272 (S.D.N.Y. 2013) (finding statement made at the time the plaintiff was fired that "'You Nigerians can't be trusted'—clearly support[s] the inference that [the plaintiff's supervisor's] decision to terminate [the plaintiff] was motivated by discriminatory animus"). In sum, with respect to her discrimination claims, Plaintiff has not met her burden to show causation, and she therefore cannot establish a prima facie case of discrimination.

b.  Non-Discriminatory Reason

Even if Plaintiff could meet her burden to establish a prima facie case of discrimination,

Defendants have proffered a legitimate, non-discriminatory reason for her termination.

At the second step of the *McDonnell Douglas* analysis, "the defendant must produce

evidence" which supports a "clear and specific" explanation for the termination, and which,

"taken as true, would permit the conclusion that there was a non[-]discriminatory reason for the

adverse action."  *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 136 (2d Cir. 2000) (quotation

marks and emphases omitted); *see also Avella v. Valley Cent. Sch. Dist.*, No. 09-CV-923, 2011

WL 6338805, at *7 (S.D.N.Y. Dec. 19, 2011) (same).  "If the defendant proffers such a reason,

the presumption of discrimination drops out of the analysis, and the defendant will be entitled to

summary judgment unless the plaintiff can point to evidence that reasonably supports a finding

of prohibited discrimination."  *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010) (alterations

and citation omitted).

Defendants argue that Plaintiff exhibited "(i) an inability or unwillingness to accept

constructive feedback; (ii) an inability to take direction; (iii) persistence in overstepping

authority; and (iv) an inability to recognize and accept her role within a larger organization."

(Defs.' Mem. at 1.)  Specifically, according to Defendants, Plaintiff's "unprofessional conduct

and poor judgment demonstrated at the January 7–8, 2019 orientation program w[ere] the final

straw[s] necessitating her termination."  (*Id.* at 17–18.)  Specifically, on the first day of the

orientation, Plaintiff made a comment that "the break was a good time for the 'ladies' to use the

bathroom."  (*Id.* at 2.)  And on the second day of the orientation, "Plaintiff unilaterally decided to

present a compliance topic when the scheduled speaker, . . . the Hospital's Vice President of

Quality and Patient Safety, ran late.  This session was required for the Hospital's Joint

Commission accreditation and Plaintiff's actions could have jeopardized such accreditation."
(*Id.*)

Courts have routinely found that a plaintiff's display of poor judgment, an inability to take constructive feedback, and an inability to follow directions to be legitimate non-discriminatory reasons for termination. *See, e.g.*, *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 74–75 (2d Cir. 2015) (employee's lack of "collegiality" and exhibit of "poor judgment" were legitimate bases for employer's adverse decision); *Davis v. State Univ. of N. Y.*, 802 F.2d 638, 642 (2d Cir. 1986) (the plaintiff's "serious conflict" with supervisors and inability to respect authority were legitimate, non-discriminatory bases for her termination); *Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir. 1985) (holding that the plaintiff's "usurpation of authority" and her "profound inability to get along with her co-workers" provided legitimate, non-discriminatory reasons for her dismissal); *Stolpner v. N. Y. Univ. Lutheran Med. Ctr.*, No. 16-CV-997, 2018 WL 4697279, at *20, *30 (E.D.N.Y. Sept. 29, 2018) (finding that the inability to follow directions or comprehend feedback are legitimate, non-discriminatory reasons for adverse employment actions); *Wolf v. Time Warner, Inc.*, No. 09-CV-6549, 2012 WL 4336232, at *10–11 (S.D.N.Y. Sept. 17, 2012) (finding that the plaintiff's "questionable professional judgment" and "repeated difficulties interacting with colleagues and supervisors" were legitimate, non-discriminatory reasons for her termination); *Williams v. McCausland*, No. 90-CV-7563, 1995 WL 548862, at *13 (S.D.N.Y. Sept. 15, 1995) ("[The plaintiff's] refusal to obey superiors [and] inability to get along with co-workers . . . are each, standing alone, sufficient to rebut a prima facie case." (italics omitted)); *Wilcox v. Runyon*, No. 94-CV-1921, 1995 WL 468270, at *4 (E.D.N.Y. July 31, 1995) ("An inability to get along with co-workers is a legitimate, non[-]discriminatory reason for terminating or disciplining an employee."); *Devine v. Whelan*, No. 90-CV-6272, 1993 WL

350049, at *3 (S.D.N.Y. Sept. 3, 1993) (finding that refusal to cooperate with other employees,

failure to carry out responsibilities, and "poor attitude" were legitimate, non-discriminatory

reasons for terminating the plaintiff).

Defendants have therefore proffered legitimate, non-discriminatory reasons for

terminating Plaintiff's employment.  Thus, the burden shifts back to Plaintiff to show that those

reasons are pretextual.

### c.  Pretext

At the third and final step of the *McDonnell Douglas* analysis, the plaintiff "must put

forth adequate evidence to support a rational finding that the legitimate non-discriminatory

reasons proffered by the employer were false, and that more likely than not the employee's sex or

race was the real reason for the discharge."  *Holt v. KMI–Cont'l, Inc.*, 95 F.3d 123, 129 (2d Cir.

1996), *cert. denied*, 520 U.S. 1228 (1997); *see also Kinsella v. Rumsfeld*, 320 F.3d 309, 314 (2d

Cir. 2003) (holding that a plaintiff "must show, using evidence constituting the prima facie case,

together with supportable inferences to be drawn from the false or erroneous character of the

employer's proffered reason, that the defendant's proffered reason was pretextual" (citation and

quotation marks omitted)).  "The plaintiff retains the ultimate burden of persuasion," but

"[s]ummary judgment is appropriate only if the employer's non[-]discriminatory reason is

dispositive and forecloses any issue of material fact."  *Kinsella*, 320 F.3d at 314 (alteration and

quotation marks omitted); *see also Clark v. Jewish Childcare Ass'n, Inc.*, 96 F. Supp. 3d 237,

254–55 (S.D.N.Y. 2015).

Plaintiff argues that Defendants' proffered reasons for Plaintiff's termination are

pretextual.  (Pl.'s Opp'n at 6–9.)  First, Plaintiff argues that "Defendants did not, and cannot,

show that Plaintiff's conduct on January 7–8, 2019 was so egregious as to provide a nondiscriminatory reason for her termination.  The reasons proffered by Defendants are clearly a pretext for terminating [Plaintiff]." (*Id*. at 7.)  The Court will not opine on whether Plaintiff's conduct was egregious enough to support her termination.  This is because "[i]t is not a court's role to second-guess an employer's personnel decisions, even if foolish, so long as they are non-discriminatory." *Greene v. Brentwood Union Free Sch. Dist*., 966 F. Supp. 2d 131, 156 (E.D.N.Y. 2013), *aff'd*, 576 F. App'x 39 (2d Cir. 2014).  District courts do not have a "roving commission to review business judgments," *Rinaldi v. Nice, Ltd*., No. 19-CV-424, 2021 WL 827767, at *7 (S.D.N.Y. Mar. 4, 2021) (quoting *Montana v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir. 1989)), and may not "sit as super personnel departments, assessing the merits—or even the rationality—of employers' non-discriminatory business decisions," *Greene*, 966 F. Supp. 2d at 156 (quoting *Mesnick v. Gen. Elec. Co*., 950 F.2d 816, 825 (1st Cir. 1991)).  Thus, "[e]vidence that [an employer] made a poor business judgment [in its adverse employment decisions] generally is insufficient to establish a genuine issue of fact as to the credibility of the [defendant's] reasons . . . [,] the reasons tendered need not be well-advised, but merely truthful." *Gilani v. Teneo, Inc*., No. 20-CV-1785, 2021 WL 3501330, at *15 (S.D.N.Y. Aug. 4, 2021) (certain alterations in original) (quoting *Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988)).  Plaintiff has offered no evidence to demonstrate that the "decision to terminate h[er] was discriminatorily motivated." *Maturine v. Am. Int'l Grp., Inc*., No. 04-CV-9064, 2006 WL 3206098, at *7 (S.D.N.Y. Nov. 6, 2006) (collecting cases); *see also Bentley v. AutoZoners, LLC*, 935 F.3d 76, 89 (2d Cir. 2019) ("[The plaintiff] cannot urge pretext simply by questioning whether her []conduct was sufficiently severe to warrant termination." (citing *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002))).  Plaintiff has therefore not met her

26

burden to show that Defendants' proffered non-discriminatory reasons for her termination were pretextual.  Thus, Defendants are entitled to summary judgment on Plaintiff's discrimination claims.

### 2.  Retaliation Claims

"Title VII forbids an employer from discriminating against an employee because the employee 'has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this subchapter.'"  *Farmer*, 473 F. Supp. 3d at 330 (alteration in original) (quoting 42 U.S.C. § 2000e-3(a)).  "The NYSHRL similarly makes it unlawful for an employer to retaliate or discriminate against an employee because she 'has opposed any practices forbidden under this article or because . . . she has filed a complaint, testified[,] or assisted in any proceeding under this article."  *Id.* (alteration in original) (quoting N.Y. Exec. Law § 296(7)).  "To make out a prima facie case of retaliation, a plaintiff must demonstrate that '(1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action."  *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (italics omitted) (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012)).

The caselaw is clear that plaintiffs engage in protected activity when they file internal or external discrimination complaints against their employer.  *See, e.g.*, *Gonzalez v. City of New York*, 377 F. Supp. 3d 273, 290 (S.D.N.Y. 2019) (finding that the plaintiff engaged in protected activity by filing an internal grievance complaining of racial discrimination); *Lewis v. Roosevelt Island Operating Corp.*, 246 F. Supp. 3d 979, 990–91 (S.D.N.Y. 2017) (finding that the plaintiff

engaged in protected activity when he reported his concerns about discriminatory conduct toward

himself and others); *Friel v. County of Nassau*, 947 F. Supp. 2d 239, 253–54 (E.D.N.Y. 2013)

(finding that the plaintiff engaged in protected activity when she "filed [an] EEOC charge

complaining of gender discrimination"); *Rodriguez v. Beechmont Bus Serv., Inc.*, 173

F. Supp. 2d 139, 150 (S.D.N.Y. 2001) (finding that the plaintiff "successfully allege[d] that he

was engaged in a protected activity" when he "lodg[ed] . . . several internal complaints regarding

[the] defendants' discriminatory conduct").

Here, Plaintiff lodged an internal discrimination complaint on January 11, 2019. (*See*

Fingerhut Decl. Ex. 2 ("Lopez Discrimination Complaint") (Dkt. No. 82-2).) Defendants do not

dispute that Plaintiff engaged in protected activity when she filed the internal discrimination

complaint. (*See* Defs.' Mem. at 21.) Defendants also do not dispute that they were aware of

Plaintiff's internal complaint, as evidenced by their prompt investigation into her allegations.

(*See* Kaur Decl. Ex. S ("Lopez Discrimination Complaint Investigation Report") (Dkt. 70-15).)

Nor do Defendants appear to dispute that Plaintiff suffered an adverse employment action when

she was terminated. (*See* Defs.' Mem. at 21; *see also* Kaur Decl. Ex. W ("Lopez Termination

Letter") (Dkt. No. 71-4).) Plaintiff therefore meets the first three elements of a prima facie case

of retaliation.

Defendants argue, however, that Plaintiff cannot meet the fourth element. Specifically,

they argue that "Plaintiff cannot assert that there is any causal connection between her internal

complaint and her termination, because the decision to terminate her employment pre-dated her

complaint by three days." (Defs.' Mem. at 21.) Plaintiff counters that the temporal proximity

between her internal discrimination complaint and her termination infers a causal connection

between the two events. (Pl.'s Opp'n at 5–6, 13.) As discussed, Plaintiff submitted her internal

complaint on January 11, 2019, (*see* Lopez Discrimination Complaint), and she was terminated on January 15, 2019, (*see* Lopez Termination Letter).

"[T]he causal connection needed for proof of a retaliation claim can be established by indirectly showing that the protected activity was closely followed in time by the adverse action." *Clark*, 96 F. Supp. 3d at 262 (quoting *Cifra*, 252 F.3d at 217); *accord Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (holding that temporal proximity alone may suffice to establish causation where proximity is "very close"); *Hopkins v. New England Care Emps. Welfare Fund*, 985 F. Supp. 2d 240, 254 (D. Conn. 2013) (same). In *Clark*, the court held that "several days" was close enough to satisfy the causal element of a prima facie case of retaliation. 96 F. Supp. 3d at 262; *see also Feliciano v. City of New York,* No. 14-CV-6751, 2015 WL 4393163, at *10 (S.D.N.Y. July 15, 2015) (collecting cases requiring adverse action to occur within approximately two months of the plaintiff's protected activity); *Lewis v. Erie Cnty. Med. Ctr. Corp.*, 907 F. Supp. 2d 336, 351 (W.D.N.Y. 2012) (holding that a warning "coming approximately one month after [the] plaintiff's final complaint . . . [was] sufficiently proximate to satisfy the inference of causation and the prima facie case of retaliation" (italics omitted)).

Defendants contend that the decision to terminate Plaintiff's employment was made by Akbar and Woolley during a meeting on January 8, 2019, and that decision was solidified during a meeting between Akbar, Kearney, and Ganung on January 10, 2019. (Defs.' Mem. at 21–22.) Defendants submitted evidence supporting this contention. Akbar attested, "I met with Ms. Woolley . . . on January 8, 2019, to inform her of Plaintiff's misconduct during orientation and to discuss Plaintiff's various ongoing performance flaws. I recommended termination of Plaintiffs employment, and Ms. Woolley agreed with and approved my recommendation." (Decl. of Dean Akbar ("Akbar Decl.") ¶ 75 (Dkt. No. 72).) Woolley corroborated Akbar's version of events,

attesting that during their January 8, 2019 meeting, "Mr. Akbar stated, and I agreed, that

Plaintiff's actions and lack of judgment during the orientation program solidified that her

employment must be terminated due to poor performance." (Decl. of Diane Woolley ("Woolley

Decl.") ¶ 23 (Dkt. No. 75).) Wooley further recalled:

> Mr. Akbar suggested that he intended to inform Plaintiff of her termination during
> the customary two-month check-in meeting for probationary employees, as it was
> an already scheduled meeting for January 17, 2021 and I agreed that made sense.
> Mr. Akbar had never been involved in the termination of any employee at [the
> Hospital] and was unfamiliar with the necessary procedures. Thus, I suggested he
> speak with Ms. Ganung and Mr. Kearney regarding the termination process, as they
> had experience in this area.

(*Id.* ¶¶ 24, 25.) Ganung shed additional light on the termination process, stating:

> On January 10, 2019, I met with Mr. Akbar and Mr. Kearney. . . . Mr. Akbar
> informed us that he had decided to terminate Plaintiff's probationary employment
> due to performance deficiencies that arose shortly after Plaintiff commenced her
> employment and that failed to improve despite providing Plaintiff many
> opportunities. He indicated that Plaintiff was not a good fit for her
> position. . . . Mr. Kearney and I agreed with the suggestion that Plaintiff be
> informed of the termination during the customary 2-month probationary check-in
> meeting scheduled for the following week on January 17, 2019.

(Decl. of Cynthia Ganung ("Ganung Decl.") ¶¶ 53, 56 (Dkt. No. 73).) Similarly, Kearney stated:

> During my January 10, 2019 meeting with Mr. Akbar and Ms. Ganung, Mr. Akbar
> also sought information on the Hospital's termination procedure and sought advice
> on when to effectuate the termination. Ms. Ganung and I agreed with Mr. Akbar's
> suggestion that Plaintiff's scheduled 2- month probationary check in meeting would
> be a natural point to advise Plaintiff of her termination.

(Decl. of Daniel Kearney ("Kearney Decl.") ¶ 19 (Dkt. No. 74).) Defendants also submitted

excerpts from the calendars of Akbar, Woolley, Ganung, and Kearney, which confirm that the

meetings in question took place on January 8 and 10, 2019. (*See* Kaur Decl. Ex. Y (Dkt. No. 71-

6).)

Plaintiff argues that Defendants did not actually decide to terminate Plaintiff during their

January 8 and 10, 2019 meetings, and that in reality, Defendants made this decision *after*

Plaintiff submitted her internal discrimination complaint.  (*See* Pl.'s Opp'n at 12–14.)  In support of this contention, she notes that the metadata on a document authored by Akbar, which is entitled "Valeria Lopez's Performance Documentation" and which contains the notation "summarized 1/11/19," (*see* Kaur Decl. Ex. R ("Lopez Performance Documentation") (Dkt. No. 70-14)), shows that it was not actually created until January 14, 2019, (*see* Fingerhut Declaration Ex. 7 (Dkt. No. 82-7)), which is three days after Plaintiff submitted her internal discrimination complaint.  However, Akbar stated that he created that document as an accompaniment to his interview in connection with the investigation into Plaintiff's internal discrimination complaint.  (*See* Akbar Decl. ¶ 91.)  Separately, Akbar stated that he maintained a running list of notes for Plaintiff, which is his standing practice for the individuals that he supervises.  (*Id.* ¶¶ 30–31; *see also* Kaur Decl. Ex. X (Dkt. No. 71-5).)  In response to Plaintiff's Opposition, Defendants provided the metadata for Akbar's lists of running notes, which show that he created the first list of notes on November 9, 2018, (*see* Reply Decl. of Dean Akbar ("Akbar Reply Decl.") Ex. AA, at 3 (Dkt. No. 87-1)), and continually updated his lists of notes throughout December and into early January, (*see* Akbar Reply Decl. Exs. BB–EE (Dkt. Nos. 87-2–87-5)).  For example, on either December 6 or 20, 2018, Akbar noted that Lopez provided the feedback that her "role feel[s] very administrative."  (Akbar Reply Decl. Ex. CC (Dkt. No. 87-3).)[4]  And, on January 4, 2019, Akbar noted that there is a "[m]isalignment with desire and what is required of the role."  (Akbar Reply Decl. Ex. EE (Dkt. No. 87-5).)[5]  Additionally, Akbar noted that there is "an overall appearance of lack of engagement," and that Plaintiff "[d]oesn't

---

[4]  It is not clear from the Exhibit whether Akbar created the document on December 6, 2018 or December 20, 2018, as there are two screenshots of metadata connected with the provided document.  (*See id.*)

[5]  The Court notes that although this document was created on January 4, 2019, it was edited on January 14, 2019.  (*See id.*)

actively listen." (*Id*.)  Further, Akbar also noted that "[w]hen feedback is given, often we discuss how [Plaintiff] disagrees or sees it differently as opposed to acknowledging that other[s'] perspective[s] matter and trying to understand observations that may be contributing to that observation." (*Id*.)  Thus, there can be no genuine dispute of material fact regarding Plaintiff's personnel and performance issues, which led to Defendants' decision to terminate Plaintiff prior to her filing an internal discrimination complaint.

The Court therefore agrees with Defendants that "[w]here the allegedly adverse action occurs *before* the allegedly protected activity, a court may appropriately decline to find a causal connection." *McIntosh v. United States*, No. 14-CV-7889, 2016 WL 1274585, at *27 (S.D.N.Y. Mar. 31, 2016); *see also Winfield v. Bishop*, No. 09-CV-1055, 2012 WL 1657190, at *4 (N.D.N.Y. May 10, 2012) ("[T]he [a]mended [c]omplaint states that other adverse action preceded the protected conduct . . . . Given these facts and the particular care with which courts must scrutinize retaliation claims, the [c]ourt finds that [the] [p]laintiff has failed to state a retaliation claim against [one of the] [d]efendant[s]."); *Rose v. Goldman*, No. 02-CV-5370, 2009 WL 4891810, at *14 (E.D.N.Y. Dec. 9, 2009) (rejecting the plaintiff's assertions of causal connection upon motion for summary judgment, and noting that the defendant took the allegedly adverse action before the plaintiff engaged in any alleged protected activity), *report and recommendation adopted*, 2011 WL 1130214 (E.D.N.Y. Mar. 24, 2011).  Additionally, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery*, 248 F.3d at 95 (finding no inference of retaliation where "the adverse employment actions were both part, and the ultimate product, of an extensive period of progressive discipline" (quotation marks omitted)); *see also Deebs v. Alstom Transp., Inc.*, 346

F. App'x 654, 658 (2d Cir. 2009) (summary order) (finding that the plaintiff's "poor performance record, and subsequent legitimate firing on the basis of that record . . . [did] not raise an inference of retaliation because [the defendant] had a basis to believe he would be a poor employee").

In sum, Plaintiff cannot show a causal nexus between her internal discrimination complaint and her termination.  Plaintiff thus cannot make out a prima facie case of retaliation.  Defendants are therefore entitled to summary judgment on Plaintiff's retaliation claims.

### 3.  Hostile Work Environment Claims

"Hostile work environment claims under both Title VII and the NYSHRL are governed by the same standard."  *See Summa v. Hofstra Univ.*, 708 F.3d 115, 123–24 (2d Cir. 2013); *Farmer*, 473 F. Supp. 3d at 334.  "A hostile work environment claim requires a showing [1] that the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and [2] that a specific basis exists for imputing the objectionable conduct to the employer."  *Alfano*, 294 F.3d at 373 (brackets in original) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)); *see also Perkins v. United States Dep't of the Treasury*, No. 18-CV-8911, 2022 WL 19772, at *15 (S.D.N.Y. Jan. 3, 2022) (same).  "It is 'axiomatic that mistreatment at work, whether through subjection to a hostile environment or through other means, is actionable . . . only when it occurs because of an employee's protected characteristic,' such as race or gender."  *Lloyd v. Holder*, No. 11-CV-3154, 2013 WL 6667531, at *11 (S.D.N.Y. Dec. 17, 2013) (alterations omitted) (quoting *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001)).

The Second Circuit has held that "[p]roving the existence of a hostile work environment involves showing both 'objective and subjective elements: the misconduct shown must be severe

33

or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive.'" *Feingold v. New York,* 366 F.3d 138, 150 (2d Cir. 2004) (quoting *Alfano*, 294 F.3d at 374). "[I]ncidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Alfano*, 294 F.3d at 374 (quoting *Perry*, 115 F.3d at 149). "Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Id.* "Hostile work environment claims are meant to protect individuals from abuse and trauma that is severe.  They are not intended to promote or enforce civility, gentility[,] or even decency." *Isbell v. City of New York*, 316 F. Supp. 3d 571, 591 (S.D.N.Y. 2018). "[E]xcessive criticism and rudeness do not constitute a hostile work environment." *Ramirez v. Temin & Co.*, No. 20-CV-6258, 2021 WL 4392303, at *8 (S.D.N.Y. Sept. 24, 2021).

Plaintiff identifies three comments in support of her hostile environment claim, which have already been described supra.  Namely, Plaintiff interpreted Akbar's constructive feedback to mean that she was overly assertive, (Lopez Dep. at 90), Akbar allegedly called her a "free spirit," (*id.* at 101), and Ganung allegedly informed her that club attire was inappropriate for the workplace and against the Hospital's dress code, (*id.* at 128).

Even construing the facts in the light most favorable to Plaintiff, including that these are actionable statements, such stray remarks alone cannot support a hostile discrimination claim.[6] *See Paul v. Postgraduate Ctr. for Mental Health*, 97 F. Supp. 3d 141, 168 (E.D.N.Y. 2015) (finding that supervisors' stray remarks could not "establish the inference of discrimination necessary for a prima facie hostile-work-environment claim" (italics omitted) (citing *Danzer v.*

---

[6] As the Court has previously mentioned, these statements identified by Plaintiff plainly were facially neutral remarks that are not actionable.

*Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998))); *see also DeLorco v. Waveny Care Ctr., Inc.*, No. 16-CV-01594, 2018 WL 4078276, at *9 (D. Conn. Aug. 27, 2018) (rejecting the plaintiff's hostile environment claim where "the only evidence of discriminatory conduct was a stray remark by [the plaintiff's supervisor]"); *Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 973 F. Supp. 2d 386, 406 (S.D.N.Y. Sept. 24, 2013) (rejecting the plaintiff's hostile environment claim where the plaintiff had highlighted "various items that made her work life unpleasant" because the "two discriminatory comments regarding her race" that she identified were not sufficient to "link[ ] those items to racial hostility"), *aff'd*, 586 F. App'x 739 (2d Cir. 2014); *Cadet v. Deutsche Bank Sec. Inc.*, No. 11-CV-7964, 2013 WL 3090690, at *10 (S.D.N.Y. June 18, 2013) (finding that supervisor's three hostile and racially tinged comments about the plaintiff were stray remarks that were insufficient to support a hostile work environment claim); *Waldo v. N.Y.C. Health & Hosp. Corp.*, No. 06-CV-2614, 2009 WL 2777003, at *6 (E.D.N.Y. Aug. 31, 2009) (rejecting the plaintiff's national-origin-based and gender-based hostile work environment claims because "the few stray remarks by co-workers and the conduct complained of were not sufficiently pervasive or severe to alter the conditions of [the plaintiff's] employment to satisfy a hostile work environment claim"); *Rissman v. Chertoff*, No. 08-CV-7352, 2008 WL 5191394, at *2–3 (S.D.N.Y. Dec. 12, 2008) (dismissing the plaintiff's race- and religion-based hostile-work-environment claim because, despite the plaintiff's "litany of facts regarding his mistreatment by co-workers and supervisors," "[t]he few facts alleged by plaintiff relating to his race or religion do not amount to more than stray remarks made by co-workers and cannot support a plausible claim of hostile work environment").  Because Akbar and Ganung's alleged stray remarks cannot alone establish a hostile work environment, Defendants are entitled to summary judgment on that claim.

35

### 4.  Aiding and Abetting Claims

Although generally, "claims brought under [the NYSHRL] are analytically identical to claims brought under Title VII," "[o]ne notable exception to this rule is that, while an individual defendant . . . may not be held personally liable under Title VII, an individual defendant may be held liable under the aiding and abetting provision of the NYSHRL if he [or she] actually participates in the conduct giving rise to a discrimination claim."  *Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011) (citations and quotation marks omitted), *cert. denied*, 565 U.S. 1260 (2012); *see also Ulrich v. Soft Drink, Brewery Workers & Delivery Emps., Indus. Emps., Warehousemen, Helpers & Miscellaneous Workers, Greater N.Y. & Vicinity, Loc. Union No. 812*, 425 F. Supp. 3d 234, 243 (S.D.N.Y. 2019).  Section 296(6) provides that it is an unlawful discriminatory practice "for any person to aid, abet, incite, compel[,] or coerce the doing of any of the acts forbidden under [the NYSHRL], or attempt to do so."  N.Y. Exec. Law § 296(6).

In order for a defendant to be liable as an aider and abettor under § 296(6), a plaintiff must first establish the existence of a primary violation of the NYSHRL by an employer or principal.  *See Forrest v. Jewish Guild for the Blind*, 819 N.E.2d 998, 1013 (N.Y. 2004); *Kelly G. v. Bd. of Educ. of City of Yonkers*, 952 N.Y.S.2d 229, 232 (App. Div. 2012); *see also Benson v. Otis Elevator Co.*, 557 F. App'x 74, 77 (2d Cir. 2014) (summary order); *Warren v. Ultimate Fitness Grp., LLC*, No. 19-CV-10315, 2021 WL 4239246, at *5 (S.D.N.Y. Sept. 17, 2021); *Mereigh v. N.Y. & Presbyterian Hosp.*, No. 16-CV-5583, 2017 WL 5195236, at *7 n.11 (S.D.N.Y. Nov. 9, 2017).  As discussed above, Plaintiff cannot establish a primary violation of the NYSHRL by the Hospital for discrimination, retaliation, or hostile work environment.  Thus, the Individual Defendants cannot be liable for aiding and abetting.  *See White v. Pacifica Found.*,

973 F. Supp. 2d 363, 378 (S.D.N.Y. 2013) (noting that where a plaintiff "has not demonstrated a primary violation, there can be no liability for aiding and abetting"); *Benjamin v. Metro. Transp. Auth.*, No. 07-CV-3561, 2012 WL 3188764, at *20 (S.D.N.Y. Aug. 2, 2012) ("Because [p]laintiff is not able to establish a primary violation [against his employer], [the] individual [d]efendants . . . cannot be liable for aiding and abetting."); *Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 363 (S.D.N.Y. 2007) ("[A]ccessory liability [under the NYSHRL] may only be found where a primary violation has been established."). Defendants are therefore entitled to summary judgment on Plaintiff's aiding and abetting claims.

### III. Conclusion

For the reasons discussed above, Defendants' Motion for Summary Judgment is granted. The Clerk of Court is respectfully directed to terminate the pending Motion, enter judgment for Defendants and close this case. (Dkt. No. 68.)

SO ORDERED.

DATED:     March 29, 2022
           White Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

37